United States District Court
For the Northern District of California

| | |
|---|---|
| Grace & Digital Information Technology Co., Ltd., | NO. C 05-00146 JW |
| Plaintiff(s), | **ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DEEMING AS MOOT FIDELITY DEFENDANTS' MOTION TO TRANSFER VENUE** |
| v. | |
| Fidelity Information Services, et al., | |
| Defendant(s). | |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

## I. INTRODUCTION

This lawsuit arises out of a business dispute between Plaintiff Grace & Digital Information Technology Co., Ltd. ("Grace") and one of its former business partners, ALLTEL Information Services, Inc. ("AIS"). There are five named defendants in this lawsuit. Defendants Fidelity Information Services, Inc. ("FIS"), Fidelity National Financial, Inc. ("FNF"), and Fidelity National Information Services, Inc. ("FNIS") (collectively "Fidelity Defendants") variously are successors-in-interest to AIS. Defendants Zhang Enzhao ("Zhang") and Prosten Technology Holdings Limited ("Prosten") (collectively "Chinese Defendants") allegedly interfered with Grace's business relationship with AIS. Grace originally filed this lawsuit in Monterey County Superior Court, alleging Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Intentional Interference with Contract. (Notice of Removal, Docket Item No. 1, Ex. 1 ¶¶ 29-47.) Fidelity Defendants removed. Presently before this Court is Plaintiff's Motion for Remand. (See Plaintiff's

Motion for Remand, hereinafter Plaintiff's Motion, Docket Item No. 8.)  This Court finds it appropriate, pursuant to Civil L.R. 7-1(b), to take Plaintiff's Motion under submission, without oral argument, for a decision based upon the parties' papers.  For the reasons set forth below, this Court GRANTS Plaintiff's Motion.

## II.  BACKGROUND

Plaintiff Grace, a Chinese corporation with its principal place of business in China, provides consulting and information technology services to financial institutions and other entities.  (Notice of Removal Ex. 1 ¶ 1.)  AIS, which was a wholly-owned subsidiary of ALLTEL Corporation, sold banking-related software and services.  (Notice of Removal Ex. 1 ¶ 2, 11.)  Defendant FIS is a successor-in-interest to AIS, and Defendant FNF later acquired FIS.[1]  (Notice of Removal Ex. 1 ¶ 2; see also Notice of Removal Ex. 1 ¶ 3 ("FNF is the 100% owner of FIS").)  Defendant FNIS is a successor-in-interest to FIS.  (Notice of Removal Ex. 1 ¶ 4.)

On June 21, 2001, Grace and AIS entered into a written contract wherein Grace agreed to assist AIS in selling AIS's software and services to China Construction Bank Corporation ("CCB"), a Chinese corporation with its principal place of business in China.  (Notice of Removal Ex. 1 ¶¶ 5, 12.)  In exchange, AIS agreed to pay Grace a percentage of the fees paid to AIS by CCB.[2]  The term of this contract was 10 years.  (Notice of Removal Ex. 1 ¶ 13; Plaintiff's Motion at 2:25.)  On July 1, 2001, Grace and AIS extended the term to 15 years.  (Notice of Removal Ex. 1 ¶ 14; Plaintiff's Motion at 2:26-27.)

On July 20, 2001, AIS signed an agreement with CCB, under which CCB paid $3,344,940.50 in fees to AIS.  (Declaration of Jim N. Wilson in Support of Plaintiff's Motion, hereinafter Wilson

---

[1] Because Grace refers to AIS as "AIS" and Fidelity Defendants refer to AIS as "FIS," this Court uses "AIS" and "FIS" interchangeably.

[2] This Court acknowledges that this issue is disputed.  Fidelity Defendants contend that AIS agreed to pay Grace only until CCB actually paid AIS.  (Fidelity Defendants' Opposition to Plaintiff's Motion, hereinafter Fidelity Defendants' Opposition, Docket Item No. 23, at 2:26.)  Grace contends that, actually, AIS agreed to pay Grace "upon the award of contracts[.]"  (Plaintiff's Motion at 2:23-24.)  This Court's presentation of the background facts is not intended to be, and should not be interpreted as, a definitive resolution of this issue.

2

Decl., Docket Item No. 25, ¶ 4.)  Pursuant to AIS's agreement with Grace, AIS, in turn, paid Grace $289,983.  (Wilson Decl. ¶ 4.)

On July 23, 2001, AIS negotiated a series of software licenses ("July Software License") with CCB.  (Notice of Removal Ex. 1 ¶ 16.)  These licenses were worth $78 million in fees to AIS.  (Notice of Removal Ex. 1 ¶ 16.)  In December 2001, AIS negotiated another series of software licenses ("December Software License") with CCB.  (Notice of Removal Ex. 1 ¶ 17.)  These licenses were worth $98 million in fees to AIS.  (Notice of Removal Ex. 1 ¶ 17.)  Grace claims that it never received its share of these fees.  (Notice of Removal Ex. 1 ¶ 18.)  Fidelity Defendants argue that these agreements never became effective.  (Fidelity Defendants' Opposition at 2:17-19 ("[E]ven though CCB signed these agreements, none of them ever became effective because CCB never received the mandatory approvals of the Ministry of Foreign Trade and Economic Cooperation"); Fidelity Defendants' Opposition at 2:21-22 ("Unfortunately for both Fidelity and Grace, however, it was not to be").)

On January 11, 2002, CCB terminated its President, Wang Xuebing, amid allegations of improprieties relating to his work for a previous employer.  Wang was later convicted and sentenced to 15 years in prison.  (Wilson Decl. ¶ 6.)  Fidelity Defendants claim that, at some point, CCB informed AIS that, "CCB had placed all projects sponsored by former President Wang, including the . . . [December 2001] agreements . . . , under review and indefinite suspension[,]" and then later "informed FIS that it deemed these agreements null and void."  (Wilson Decl. ¶ 6.)

Thereafter, Fidelity Defendants claim, AIS "urgently sought assistance from Grace to get CCB to reinstate the contracts[,]" but that Grace failed to take any action.  (Fidelity Defendants' Opposition at 3:7; see also Fidelity Defendants' Opposition at 3:7-8 ("Grace did nothing, except to suggest that FIS sue CCB"); Fidelity Defendants' Opposition at 3:9-10 ("[N]o one even answered the telephone at Grace's Beijing office"); Fidelity Defendants' Opposition at 3:10-12 ("FIS sought diplomatic assistance through the U.S. embassy, the U.S. Department of Commerce, and the PRC-American Chamber of Commerce [to get in contact with CCB], and it pursued every other potentially helpful

contact, with no support from Grace, all without success").)  On March 28, 2002, AIS allegedly wrote a letter to Grace, notifying Grace that AIS would terminate their agreement in one month.  (Fidelity Defendants' Opposition at 4:15-17.)  According to Fidelity Defendants, "Grace did nothing, and the Agreement expired on April 28, 2002, one month after FIS sent its notice of termination."  (Fidelity Defendants' Opposition at 4:22-23.)  Grace disputes the effectiveness of AIS's alleged termination.  (Plaintiff's Reply at 6:17-7:3.)

Grace later engaged Defendant Prosten, a publicly traded company headquartered in Hong Kong, as its new local sales/marketing agent in China.  (Fidelity Defendants' Opposition at 3:25-4:5.)  In May 2002, AIS organized an all-expense-paid golf trip to Pebble Beach.  (Notice of Removal Ex. 1 ¶ 19.)  The foursome included:  Jim Wilson (a senior AIS officer), Defendant Zhang (CCB's new President), Zhou Jianhua (Zhang's personal friend and next-door neighbor), and Bobby Yip (an executive director of Prosten).  (Notice of Removal Ex.l 1 ¶ 19; Plaintiff's Motion at 3:7-12; Fidelity Defendants' Opposition at 5:5-10; Plaintiff's Reply to Fidelity Defendants' Opposition, hereinafter Plaintiff's Reply, Docket Item No. 37, at 4:17-18.)  Grace alleges that this golf trip interfered with Grace's continuing contractual relationship with AIS.  According to Grace, at this golf trip, "Messrs. Zhang, Zhou, Yip and Prosten . . . colluded with Jim N. Wilson, President, Financial Services -- International of AIS . . . , in causing AIS to renege on its obligation to pay Grace [its] . . . commissions under the Grace-AIS Agreement by concocting 'new contracts' ostensibly to replace the July Software License and December Software License, which had been procured through Grace's efforts."  (Notice of Removal Ex. 1 ¶ 21.)  Specifically, Grace alleges that, in exchange for helping AIS to renege on its obligations to Grace, AIS paid Zhang over $1 million, which was disguised as a consulting fee to Prosten, and paid (and continues to pay) Zhou $3,500 per month.  (Notice of Removal Ex. 1 ¶ 22.)  Fidelity Defendants contend that the golf trip to Pebble Beach occurred *after* it had legitimately terminated its agreement with Grace.  (Fidelity Defendants' Opposition at 5:6.)

Grace filed suit against Fidelity Defendants, claiming Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing.  Grace filed suit against Chinese Defendants,

4

claiming Intentional Interference with Contract.

## III. STANDARDS

A motion to remand is the proper procedure for challenging removal. WILLIAM W. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 2:1081 (2005). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. 28 U.S.C. § 1447(c). The defendant seeking removal of an action to federal court bears the burden of establishing grounds for federal jurisdiction. Id. § 2:609. Removal statutes are construed restrictively, so as to limit removal jurisdiction. Ethridge v. Harbor House Restaurant, 861 F.2d 1389, 1393 (9th Cir. 1988) ("[T]he removal statute is strictly construed against removal jurisdiction"). Doubts as to removability are resolved in favor of remanding the case to state court. SCHWARZER ET AL., supra, § 2:606 (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941) and Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992)).

## IV. DISCUSSION

**A. This Court Does Not Have Subject Matter Jurisdiction Over this Lawsuit**

Fidelity Defendants "remove[d] this case based on alienage jurisdiction, 28 USC § 1332(a)(2)." (Notice of Removal ¶ 2.) Title 28 U.S.C. § 1332(a)(2) provides district courts with original jurisdiction over "civil actions where the matter in controversy exceeds the sum . . . of $75,000, and is between-- . . . citizens of a State and citizens or subjects of a foreign state." Plaintiff Grace is a Chinese company with its principal place of business in China. (Notice of Removal Ex. 1 ¶ 1.) Fidelity Defendants are United States corporations with their principal places of business in the United States. (Notice of Removal Ex. 1 ¶¶ 2-4.) Defendant Zhang is a Chinese citizen. (Notice of Removal Ex. 1 ¶ 5.) Defendant Prosten is a Cayman Islands company with its principal place of business in Hong Kong, China. (Notice of Removal Ex. 1 ¶ 8.)

Federal courts have subject matter jurisdiction over lawsuits between, on the one hand, aliens (and only aliens) and, on the other hand, citizens (and only citizens). See 28 U.S.C. § 1332(a)(2);

5

SCHWARZER ET AL., supra, § 2:345 ("Diversity based on alienage exists where there are one or more aliens on one side of the lawsuit, and one or more citizens of a state on the other").  Furthermore, federal courts have subject matter jurisdiction over lawsuits between citizens of different states--even if aliens are on both sides of the lawsuit.  See 28 U.S.C. § 1332(a)(3); Transure, Inc. v. Marsh & McLennan, Inc., 766 F.2d 1297, 1299 (9th Cir. 1985) ("[T]he language of [28 U.S.C.] section 1332(a)(3) is broad enough to allow aliens to be additional parties on both sides of [a] dispute [between diverse citizens]").  Federal courts do *not* have subject matter jurisdiction over lawsuits between aliens.  Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A., 20 F.3d 987, 991 (9th Cir. 1994) ("[D]iversity jurisdiction does not encompass a foreign plaintiff suing foreign defendants") (citing Cheng v. Boeing Co., 708 F.2d 1406, 1412 (9th Cir. 1983)); SCHWARZER ET AL., supra, § 2:349 ("There is no alienage jurisdiction, however, in actions by one foreign subject (alien) against another").

What about lawsuits such as this one, wherein an alien sues citizens and aliens?  Do federal courts have subject matter jurisdiction over them?  The answer is no.  "[I]f an alien plaintiff sues an alien and a citizen of a state, there is no diversity jurisdiction . . . ."  15 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 102.77 (3d ed. 2005); see also SCHWARZER ET AL., supra, § 2:354 ("Example:  P (citizen of Japan) sues D1 (Swiss citizen) and D2 (citizen of New York).  There is no alienage jurisdiction (because alien on each side) and no diversity jurisdiction (because P is not a U.S. citizen).") (citing Faysound, ltd. v. United Coconut Chemicals, Inc., 878 F.2d 290, 294 (9th Cir. 1989).

**B.  Fidelity Defendants Fail to Prove that Chinese Defendants Are Fraudulently Joined**

Fidelity Defendants argue that Chinese Defendants' presence can be ignored because they have been fraudulently joined to this lawsuit.  (Fidelity Defendants' Opposition at 6:4-8.)  Under the doctrine of fraudulent joinder,"a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is ignored for purposes of determining diversity, '[i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is *obvious* according to the settled rules

6

of the state.'" Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1067 (9th Cir. 2001) (emphasis added). The burden of proving fraudulent joinder is a heavy one. SCHWARZER ET AL., supra, § 2:680 ("The removing defendant has the heavy burden of alleging and proving the nondiverse party's joinder is 'sham' or 'fraudulent'"). In fact, some courts have held that a removing defendant must prove fraudulent joinder by clear and convincing evidence. Id. § 2:682. Fidelity Defendants have not satisfied their heavy burden.

**1. Fidelity Defendants Incompletely and Incorrectly Apply California's Choice of Law Principles**

First, Fidelity Defendants argue that, under California's choice of law principles, California courts would apply Chinese law against Chinese Defendants. (Fidelity Defendants' Opposition at 6:20-22, 7:1-12:11.) Since Chinese law does not recognize claims for Tortious Interference with Contractual Relations, Fidelity Defendants argue, Grace fails to state a claim against Chinese Defendants. (Fidelity Defendants' Opposition at 6:20-22, 7:1-12:11.) Fidelity Defendants' arguments suffer from a number of infirmities.

As an initial matter, Fidelity Defendants only address the conflict of law between California and China. They fail to address other fora's interests in having their laws applied to this lawsuit. For example, Prosten is a Cayman Islands corporation with its principal place of business in Hong Kong. Fidelity Defendants fail to state why Cayman Islands and Hong Kong lack interest in having their laws applied to this lawsuit. As Grace notes, Hong Kong law *does* recognize claims for Tortious Interference with Contractual Relations. (Plaintiff's Reply at 13:2-7.)

Moreover, Fidelity Defendants incorrectly apply California's choice of law principles. In choosing law, California courts apply a three-part test:

> First, we determine whether the two concerned states have different laws. Second, we consider whether each state has an interest in having its law applied to this case. Finally, if the laws are different and each state has an interest in having its own law applied, we apply the law of the state whose 'interests would be more impaired if its policy were subordinated to the policy of the other state.'

Havlicek v. Coast-to-Coast Analytical Servs., Inc., 39 Cal. App. 4th 1844, 1851 (1995) (citing North American Asbestos Corp. v. Superior Court, 180 Cal. App. 3d 902, 905 (1995)). California's three-

1  part test fuses two choice of law approaches:  (1) Professor Brainerd Currie's "governmental interest

2  analysis" approach, which informs the first and second parts, and (2) Professor William Baxter's

3  "comparative impairment" approach, which informs the third part.[3]  Fidelity Defendants recite this test

4  correctly, but they apply it incorrectly.

5        Under California's choice of law principles, California's and China's respective "governmental

6  interests" in having their laws applied to this lawsuit must be ascertained *in light of the purposes*

7  *underlying their respective laws*.  To determine a state's "governmental interest" in having its law

8  applied to a given case, courts apply a two-step process.  First, they ascertain the *purpose* that led to

9  the adoption of a given law in wholly domestic cases.  DAVID P. CURRIE, HERMA HILL KAY & LARRY

10 KRAMER, CONFLICT OF LAWS 146 (6th ed. 2001) (citing Larry Kramer, *Rethinking Choice of Law*, 90

11 COLUM. L. REV. 277, 299 (1990)).  Second, they determine which *contacts* bring a multistate case

12 within that purpose.  Id.  "Underlying both steps is the assumption that a law should be interpreted and

13 applied in a way that advances its purpose."  Id.  Fidelity Defendants altogether fail to examine the

14 purposes underlying California's recognition of claims for Tortious Interference with Contractual

15 Relations and China's non-recognition of such claims.  Instead, Fidelity Defendants conflate

16 California's "governmental interest analysis" approach to choice of law with the RESTATEMENT

17 (SECOND) OF CONFLICT OF LAWS's "most significant relationship" approach to choice of law.  (See

18 Fidelity Defendants' Opposition at 9:3-11.)

---

[3] Some commentators have criticized this fusion.  In particular, they argue that the fusion of Professor Baxter's "comparative impairment" approach with Professor Currie's "governmental interest analysis" approach distorts the policies underlying Professor Currie's methodology.  See Herma Hill Kay, *The Use of Comparative Impairment to Resolve True Conflicts:  An Evaluation of the California Experience*, 68 CAL. L. REV. 577, 578 (1980) ("[T]his Article concludes that, if the California Supreme Court wishes to continue to use Currie's methodology to resolve choice of law cases, it should reject comparative impairment analysis as inconsistent with that approach"); see also id. (citing Leo Kanowitz, *Comparative Impairment and Better Law:  Grand Illusions in the Conflict of Laws,* 30 HASTINGS L.J. 255 (1978), which argued that the use of comparative impairment should be abandoned and that California should return to the doctrinal purity of governmental interest analysis).

### 2. Chinese Defendants Can Consent to Personal Jurisdiction in California

Second, Fidelity Defendants argue that Grace's lawsuit fails because the state court lacks personal jurisdiction over Chinese Defendants. (See Fidelity Defendants' Opposition at 12:12-17:11.) This is unpersuasive because a defendant can consent to personal jurisdiction. SCHWARZER ET AL., supra, § 3:64 ("Local courts can exercise personal jurisdiction over nonresidents who consent to local personal jurisdiction . . . regardless of 'minimum contacts'"). To establish fraudulent joinder, Fidelity Defendants must prove that no possible cause of action has been stated against Chinese Defendants. See Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1067 (9th Cir. 2001). Because Chinese Defendants could feasibly consent to personal jurisdiction, Fidelity Defendants cannot prove that no possible cause of action has been stated against them.

### 3. It Is Not Obvious that the State Court Would Dismiss this Lawsuit on Grounds of Forum Non Conveniens

Third, Fidelity Defendants argue that Grace's lawsuit fails because, as a matter of state law, the state court would dismiss it on grounds of forum non conveniens. (Fidelity Defendants' Opposition at 17:12-20:3.) "In assessing a forum non conveniens motion the trial court looks first to whether the alternative forum is a suitable place for trial. If it is then the court looks to the private interests of the litigants and the public interest in keeping the case in California." Century Indem. Co., 58 Cal. App. 4th 508, 512 (1997) (citations omitted). Fidelity Defendants' argument is unpersuasive because the resolution of forum non conveniens motions largely falls within the state court's discretion. Am. Cemwood Corp. v. Am. Home Assurance Co., 87 Cal. App. 4th 431, 436 (2001) ("The balancing of private and public interests is a task squarely within the trial court's discretion"). Because the state court enjoys wide latitude in resolving a forum non conveniens motion, Fidelity Defendants cannot prove that Grace's claim against Chinese Defendants *obviously* fails as a matter of state law. In any event, this Court has little familiarity with state law-based forum non conveniens because it always applies federal law to forum non conveniens motions. Ravelo Monegro v. Rosa, 211 F.3d 509, 511-12 (9th Cir. 2000) ("[S]everal circuits have held that a forum non conveniens motion in federal court is governed by federal law. . . . We join these circuits and hold that federal rather than state law

governs.").

Because Fidelity Defendants have failed to establish the basis of this Court's jurisdiction, this Court remands this lawsuit to Monterey County Superior Court. If, through an amended pleading, motion, order, or other paper, Defendant later learns that this lawsuit is in fact removable, it may file a notice of removal pursuant to 28 U.S.C. § 1446.

## V.  CONCLUSION

For the reasons set forth above, this Court GRANTS Plaintiff's Motion to Remand. Accordingly, this Court also deems as moot Fidelity Defendants' Motion to Transfer Venue (Docket Item No. 21).

Dated:  May 23, 2005

/s/James Ware
JAMES WARE
United States District Judge

05cv146mtr-mtv

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

David W. Shapiro dshapiro@bsfllp.com
Frank E. Merideth meridethf@gtlaw.com
Stuart H. Singer ssinger@bsfllp.com
William Thomas Dzurilla wdzurilla@bsfllp.com

**Dated:  May 23, 2005**                               **Richard W. Wieking, Clerk**

                                                       **By:/s/JWchambers**
                                                             **Ronald L. Davis**
                                                             **Courtroom Deputy**

**United States District Court**
For the Northern District of California